UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

CATHERINE CABOTAGE,

      Plaintiff,

  v.                                   Case No. 2:11-cv-50
                                         JUDGE SMITH
OHIO HOSPITAL                         Magistrate Judge Deavers
FOR PSYCHIATRY, LLC, *et al.*,

      Defendants.

## OPINION AND ORDER

      Plaintiff, Catherine Cabotage, brings this action against Defendants, Ohio Hospital for Psychiatry, LLC ("OHP") and Behavioral Centers of America, LLC ("BCA"), arising from Defendants' termination of her employment. She alleges violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.*, Ohio's Nurses Whistleblower Act, Ohio Revised Code § 4723.33, and Ohio's public policy. This matter is before the Court on Defendants' Motion for Summary Judgment. (Doc. 24). For the reasons that follow, the Court **GRANTS** Defendants' Motion for Summary Judgment.

I.    BACKGROUND

      Defendant OHP is a psychiatric care facility, which provides psychiatric care to children, adolescents, adults, and seniors. (Defs.' Mot. for Summ. J. at 2). Defendant OHP is operated by Defendant BCA. (Compl. at ¶ 5). Plaintiff is a registered nurse licensed to practice in Ohio since 1976. (Cabotage Aff., Apr. 6, 2012, ¶¶ 4-5). She has twenty-four years of experience working in psychiatric healthcare facilities, four of which were spent in geriatric psychiatric units. (*Id.* at ¶ 5). Plaintiff began working as a registered nurse on the geriatric unit for OHP on

November 19, 2009.  (*Id.* at ¶ 9).  Plaintiff alleges that she became concerned that OHP's medical director, Dr. Christopher Corner, engaged in fraudulent and illegal activities, so she gathered evidence to support her suspicions at the suggestion of Helena Habib, the chief nursing officer at the time.  (*Id.* at ¶¶ 15, 34-37).  The evidence Plaintiff gathered included recording her observations of Dr. Corner's activities on the Census, a daily document that lists patients' names, sexes, ages, and dates of admission.   (*Id.* at ¶¶ 8-10, 35).  Plaintiff contends that she was never instructed that the Census was considered confidential patient information.  (*Id.* at ¶ 14).  Plaintiff also made copies of other documents, including Dr. Corner's patient progress notes.  (Cabotage Aff., ¶ 36).  Plaintiff gave Ms. Habib a copy of the progress notes and a summary of her observations.  (*Id.* at ¶ 37). On February 2, 2010, Plaintiff and Ms. Habib met with Sherri Artman, the Vice President of Human Resources.  (*Id.* at ¶ 38).  At this meeting, Plaintiff told Ms. Artman about Dr. Corner's conduct that she had observed and believed to be illegal and fraudulent.  (*Id.* at ¶ 38). Plaintiff believed that OHP billed the United States government through Medicare and Medicaid for Dr. Corner's services.  (*Id.* at ¶ 29).

On February 15, 2010, Defendant OHP fired Ms. Habib.  (*Id.* at ¶ 41).   As a result, Plaintiff was worried that her complaints would be ignored and was unsure about what had happened to the documents she had given Ms. Habib.  (Cabotage Aff., ¶ 42).   Plaintiff took the copies of Dr. Corner's progress notes home because she did not know another way to prove that her concerns about him were true.  (*Id.* at ¶¶ 42-43).  On February 18, 2010, Plaintiff called the Medicare Fraud Hotline and reported her "concerns about Dr. Corner and OHP falsifying documents . . . ."  (*Id.* at ¶ 44).  The next day, the Ohio Department of Mental Health conducted

an on-site investigation in response to an anonymous telephone complaint they received on February 18, 2010.  (*Id.* at ¶¶ 45-46).

On February 23, 2010, a patient told Plaintiff that she did not want to take the medicine that had been prescribed to her by Dr. Corner and that Dr. Corner had not seen her.  (*Id.* at ¶¶ 48-49).  The patient asked Plaintiff to call the patient's daughter to tell her that the patient did not want to take the medication and the reason why.  (*Id.* at ¶ 50).  That night, Plaintiff took one Census document home with her for the purpose of calling a patient's daughter, at the patient's request and, she alleges, with the patient's written consent. (Cabotage Aff., ¶¶ 50-56). She called the patient's daughter while she drove home after work.  (*Id.* at ¶ 57).  Plaintiff took copies of the progress notes home because she was concerned that Dr. Corner might remove or alter the originals.   (*Id.* at ¶¶ 36, 40, 42).

On March 8, 2010, OHP terminated Plaintiff for "fraternizing with patients' families outside of work" in violation of OHP's confidentiality policies. (Compl. at ¶ 27).  Defendants contend that it is a violation of company policy to contact a family member of a patient without a written release or to remove confidential patient information from the facility. (Defs.' Mot. for Summ. J. at 5).  When Sally Boyce, the chief nursing officer, learned of Plaintiff's communication outside of work, she checked the patient's file, and did not find a written release signed by the patient. (Boyce Dep., Mar. 13, 2012, at 16, ¶¶ 2-13).  Defendants assert that Plaintiff wrongfully removed patient-identifying protected health information to make the phone call.  (Defs.' Mot. for Summ. J., at 5).  Furthermore, Defendants contend that Dr. Corner is not in fact their employee, so any investigation Plaintiff conducted does not fall within the False Claims Act.  (Defs.' Mot. For Summ. J. at 7).

On March 25, 2010, Plaintiff gave copies of the progress notes to a special investigator from the United States Department of Health and Human Services. (Cabotage Aff., at ¶ 77). She did not tell anyone about or disclose the Census document until she gave it to her attorney in connection with this case. (*Id.* at ¶¶ 45, 60-61). Plaintiff asserts that OHP did not know that she had the Census or any of the other documents until her attorney produced them in the course of this case. (*Id.* at ¶ 74). In March 2012, Defendants filed their motion for summary judgment. This motion is fully briefed and ripe for review.

## II.  STANDARD OF REVIEW

The standard governing summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.,* 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must view all the facts, evidence and any inferences that may permissibly be drawn from the facts, in favor of the nonmoving

party.  *Matsushita*, 475 U.S. at 587.  The Court will ultimately determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Liberty Lobby*, 477 U.S. at 251-53.  Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried.  *Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir. 1978).  The Court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter.  *Liberty Lobby*, 477 U.S. at 249; *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).

In responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'"  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Liberty Lobby*, 477 U.S. at 257).  The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party.  *Liberty Lobby*, 477 U.S. at 252.  The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts."  *Moore v. Phillip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993).  The Court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence.  *Liberty Lobby*, 477 U.S. at 251-52; *see also Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street*, 886 F.2d at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

### III.  ANALYSIS

Plaintiff alleges that she was engaged in whistleblowing activity, Defendants knew about her activity, and Defendants fired her in retaliation for that activity. Plaintiff contends that her discharge was impermissible under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, the Ohio Nurses Whistleblower Act, Ohio Revised Code § 4723.33, and Ohio public policy. The Court will address these claims in turn.

#### A.  Claim under the False Claims Act

Under the False Claims Act ("FCA"), 31 U.S.C. section 3730(h)(1), "[a]ny employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged . . . because of lawful acts done by the employee . . . in furtherance of an action under this section . . . ." (2010). To prove a claim of retaliation under section 3730(h)(1), a plaintiff must show that "(1) the employee engaged in conduct protected by the Act; (2) the employer knew that the employee was engaging in protected conduct; and (3) the employer retaliated . . . against the employee [at least in part] because of his or her protected activity." *Nguyen v. City of Cleveland*, 121 F. Supp. 2d 643, 649 (N.D. Ohio 2000). "'Protected activity' means 'lawful acts done by the employee on behalf of the employee or others in furtherance of an [FCA] action, including investigation for, initiation of, testimony for, or assistance in an [FCA] action filed or

to be filed . . . .'" *United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 449 (6th Cir. 2008) (quoting 31 U.S.C. § 3730(h)).

Absent direct evidence of retaliation, under the *McDonnell Douglas* burden-shifting framework, the employee must show that the adverse employment action was motivated at least in part by the employee's engagement in protected activity. *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002). If the plaintiff employee proves the *prima facie* case, the burden then shifts to the defendant employer to show that it would have made the same decision even absent the protected conduct. *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009). Then, the burden shifts back to the plaintiff to establish pretext. *Id.*

First, to meet the burden of showing the employee engaged in protected activity, the plaintiff must show that he or she engaged in "activity which reasonably could lead to a viable FCA action." *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 516 (6th Cir. 2000) (citing *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C. Cir. 1998)). However, "reporting alleged wrongdoing to supervisors is not sufficient to meet the requirement for protected activity. [citation omitted] . . . . Nor is an employee's investigation of nothing more than the employer's non-compliance with federal or state regulations." *United States ex rel. Judd v. Maloy*, No. 3:03-CV-241, 2006 U.S. Dist. LEXIS 63465, at 28 (S.D. Ohio, Sept. 6, 2006) (citing *Yesudian*, 153 F.3d at 740). Furthermore, "[s]imply reporting his concern of a mischarging to the government to his supervisor does not suffice to establish that [the employee] was acting 'in furtherance of' a qui tam action." *Zahodnick v. IBM*, 135 F.3d 911, 914 (4th Cir. Md. 1997). Essentially, the employee must be investigating an action that pertains to fraudulent claims. *McKenzie*, 219 F.3d at 514. With regard to the investigated fraud, the reasonableness is

determined by "information known to [the plaintiff] at that time the allegations were made . . . ." *Field v. F & B Mfg. Co.*, No. 94 C 5379, 1996 U.S. Dist. LEXIS 6014, *16 (N.D. Ill. May 6, 1996) (citing *Neal v. Honeywell Inc.*, 33 F.3d 860, 864 (7th Cir. 1994), *overruled in part on other grounds by Graham Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409 (2005)).

In the present case, Plaintiff, an employee of Defendant OHP, had concerns about medical treatment provided by Dr. Corner. She discussed these concerns with the chief nursing officer, Ms. Habib, who "directed [Plaintiff] to gather evidence to support [her] concerns" by making notations of where the doctor was in the unit during the day and to get copies of his documentation for the day." (Cabotage Aff., at ¶¶ 30, 34). Plaintiff observed and made notes about Dr. Corner's work, made copies of his "progress notes," gave her notes to Ms. Habib, and met with Ms. Artman, the Vice President of Human Resources. (*Id.* at ¶¶ 35-38). Plaintiff asserts that she believed Defendant OHP billed the government through Medicare and Medicaid for Dr. Corner's services and that she believed the conduct she observed was illegal and fraudulent. (*Id.* at ¶¶ 29, 38). However, Plaintiff fails to allege that she investigated whether fraudulent claims were actually submitted to the government. She assumed that Defendant OHP billed for Dr. Corner's services, and she took no action to substantiate this ultimately incorrect assumption. (*Id.* at ¶¶ 78-79). Plaintiff avers that her actions were focused on reporting "care that was being provided that was dangerous to the patients and substandard clinically and possibly illegal." (Cabotage Dep. At 68, ¶ 15). Like the plaintiffs' actions in *Judd* and *Zahodnik*, Plaintiff's activity does not rise to the level of protected activity, and she has failed to show a genuine dispute as to the first element of her retaliation claim.

Second, an employee must prove that the employer knew about the employee's protected activity. *Marlar*, 525 F.3d at 449. In *Marlar*, the plaintiff alleged that she "repeatedly objected to her superiors about the inaccurate medical records," and "raised similar objections during an open forum where employees could express grievances or complaints." *Id.* The court noted that those allegations alone likely did not suffice to show that plaintiff's employer was on notice of plaintiff's protected activity. *Id.* However, plaintiff took the additional action of writing a letter to the president and general manager stating that she had been placed on administrative leave for refusing to take part in "illegal activities." *Id.* The court held that, in light of all of this conduct, the employer knew about the employee's protected activity. *Id.* In *Judd,* the plaintiff attempted to establish this element by alleging that he repeatedly brought the billing issue to the attention of his supervisor, who was the CEO, and the Alcohol, Drug Addiction and Mental Health Services Board. *Judd*, 2006 U.S. Dist. LEXIS 63465, at *31. The court held that raising the billing issue was not protected activity, so the plaintiff's communications with the CEO and the Board did not establish the second element. *Id.*

In the present case, Plaintiff's conduct closely parallels that of the plaintiff in *Judd*. Here, Plaintiff asserts that she had conversations with her supervisor, Ms. Habib, and Defendants' Vice President of Human Resources, Ms. Artman. (Cabotage Aff., ¶¶ 30, 38). Plaintiff also anonymously called the Medicare Fraud Hotline and made a report, which Plaintiff asserts led the Ohio Department of Mental Health to conduct an on-site investigation the following day. (*Id.* at ¶¶ 44-45). Furthermore, Defendants' Human Resources Director, Ms. Powers, was aware that Plaintiff had filed a complaint about a doctor with Ms. Habib. (Powers Dep., Mar. 13, 2012, at 7-9). Additionally, while Plaintiff alleged that she believed Dr. Corner's conduct to be

fraudulent, Plaintiff did not allege that she characterized it as fraudulent or illegal in her communications with her superiors.  The Defendants may have been aware of Plaintiff's conduct, but not that it was protected activity.  As noted above, Plaintiff has not alleged that she investigated whether fraudulent claims were actually submitted to the government.  Her actions were focused on reporting "care that was being provided that was dangerous to the patients and substandard clinically and possibly illegal." (Cabotage Dep. at 68, ¶ 15).  Therefore, Plaintiff fails to allege facts that suggest that Defendants knew that Plaintiff's activity was protected.  Accordingly, Plaintiff has failed to establish the second element of her retaliation claim.

Third, an employee must establish that the employer took adverse action against the employee at least in part because of the employee's protected activity.  *Nguyen*, 121 F. Supp. 2d at 649.  Temporal proximity alone is insufficient to show causation.  *Balmer v. HCA, Inc.*, 423 F.3d 606, 615 (6th Cir. 2005).  In the present case, Defendants do not contest that an adverse action was taken against Plaintiff in that she was terminated.  Plaintiff contends that causation is shown by notes referring to her as a whistleblower; the fact that Ms. Boyce was told that Plaintiff had made a complaint to the State, even though that complaint was anonymous; and inferences that administrators must have known about Plaintiff's complaints because they did not question Plaintiff about them further.  As to the temporal proximity, Plaintiff summarily asserts that she has presented evidence demonstrating that her termination was close in time to her conduct.  Based on these facts, it is possible that a reasonable jury could find that the decision to terminate Plaintiff was based at least in part on her conduct.  However, as previously stated, her conduct does not rise to the level of protected activity, so Plaintiff has failed to prove her *prima facie* case with respect to the causation element.

Even assuming Plaintiff can establish a *prima facie* case, Defendants have met their burden of showing that they would have made the same decision even absent any protected conduct. *See Ladd*, 552 F.3d at 502. In the present case, Defendants assert that their legitimate, nondiscriminatory reason for terminating Plaintiff was her violation of Defendants' confidentiality policies by contacting a patient's family from home without proper authorization. Defendants also assert that Plaintiff violated the policies by taking confidential documents home with her.

Regarding the fact that Plaintiff removed a confidential patient document as grounds for termination, Defendants did not learn of this until the commencement of this case; even so, Defendants still had a legitimate, non-discriminatory reason for terminating Plaintiff as she was in violation of their policies by contacting a patient's family from home without a signed consent. Furthermore, even if a question remains whether Plaintiff received a signed consent form to contact the patient's family, there is evidence that Defendants looked for the signed consent form in the patient's file and the form was not there. (Boyce Dep. at 16). Therefore, Defendants have established a legitimate, non-discriminatory reason for terminating Plaintiff.

Because Defendants set forth a legitimate, non-discriminatory reason for Plaintiff's termination, the burden shifts back to Plaintiff to show that Defendants' proffered reason is pretext and not the real reason for the adverse action. *See Ladd*, 552 F.3d at 502. To succeed in showing pretext, the plaintiff must present sufficient evidence from which a jury could "reasonably reject the defendant's explanation" and infer that the defendant intentionally retaliated against the plaintiff. *Balmer*, 423 F.3d at 614. "A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either

(1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008).

In the present case, Plaintiff contends that Defendants' reason was pretext because the punishment of termination was unreasonable for a single instance of alleged misconduct. Evidence shows that Plaintiff was terminated because she violated their policies by contacting a patient's family from home without proper authorization. Defendants' policies expressly prohibit the disclosure of patient information without proper authorization, and indicate that violation of confidentiality rules is a serious matter that may result in termination. Plaintiff does not dispute that she called a patient's family member from her car, and she has presented no evidence that proper authorization was placed in the patient's file. Furthermore, Defendants' employment policies are facially legitimate and, as such, will not be "second-guessed" by this Court. *See Brummett v. Lee Enters.*, 284 F.3d 742, 745 (7th Cir. 2002) ("we will not second-guess an employer's policies that are facially legitimate"). Therefore, Plaintiff fails to show that the Defendants' proffered reason was pretext.

For these reasons, the Court concludes that Defendants have shown that there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law as it relates to Plaintiff's claim under the False Claims Act.

**B.     State Law Claims**

A district court may decline to exercise supplemental jurisdiction over state law claims once it has dismissed all claims over which it possessed original jurisdiction. *See Midwest Towing & Recovery, Inc. v. City of Lancaster*, No. 2:09–cv–1142, 2011 U.S. Dist. LEXIS 9387, 2011 WL 249467 (S.D. Ohio Jan. 26, 2011) (citing *Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226,

233 (6th Cir. 1997)). The Sixth Circuit has further stated that generally where the federal claims are dismissed before trial, the state law claims should be dismissed as well. *See Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001) (the "usual course is for the district court to dismiss the state-law claims without prejudice if all federal claims are disposed of on summary judgment). Having dismissed Plaintiff's federal claim, the Court declines to exercise supplemental jurisdiction over the remaining state law claims asserted against Defendants, and those are dismissed as well.

## IV. DISPOSITION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 24). The False Claims Act claim is dismissed with prejudice, and the state law claims are dismissed without prejudice.

The Clerk shall remove Document 24 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**

 *s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**